FILED
2015 Aug-26 PM 02:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **JEFFREY S. CHAPMAN, TERRANCE ANDERSON, ELLIS BALL, CHRISTOPHER BATES, GLEN BISHOP, EMANUEL CADDELL, KENNETH CHANDLER, JAMES J. FREEMAN, KENNETH O. JONES, CORY NELSON, LISA NELSON, DONALDVIN BALL, CHRISTOPHER S. CARGILE, DeMARCUS R. COATS and BRANDON LONG,** | § | **CIVIL ACTION NO.** |
| **Plaintiffs,** | § | **7:14-cv-01956-LSC** |
| **v.** | § | **JURY DEMAND** |
| **TALCO SECURITY INCORPORATED** | § | |
| **Defendant.** | § | |

## THIRD AMENDED COMPLAINT

COME NOW the Plaintiffs, Jeffrey S. Chapman, Terrance Anderson, Ellis Ball, Christopher Bates, Glen Bishop, Kenneth Chandler, James J. Freeman, Cory Nelson, Lisa Nelson, Donaldvin Ball, Christopher S. Cargile, DeMarcus R. Coats and Brandon Long (hereinafter "Plaintiffs"), by and

through counsel, for their Third Amended Complaint against Defendant, Talco Security Incorporated, (hereinafter "Talco" or "Defendant"), seeking to recover for Defendant's violations of the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 201 *et seq.*, hereby state and allege as follows:

## INTRODUCTION

1. This is an action brought pursuant to FLSA §216(b) by Plaintiffs for purposes of obtaining relief under the FLSA for unpaid wages, unpaid overtime wages, liquidated damages, costs, attorneys' fees, declaratory relief, and/or any such other relief the Court may deem appropriate.

2. Defendant Talco, from its headquarters in Tennessee, solicits customers in Alabama and, accordingly, provides security services to apartment complexes, sorority houses, and other related businesses in and around Tuscaloosa, Alabama.

3. Defendant uniformly denies compensation, including overtime premium pay, to its hourly workers who work in excess of forty (40) hours in a week. Defendant's deliberate failure to pay these employees overtime compensation violates federal law, as set out in the Fair Labor Standards Act.

4. Plaintiffs perform various functions, but are all victims of the same illegal policy and practice of failing to pay overtime at appropriate rate.

**JURISDICTION AND VENUE**

5. The FLSA authorizes court actions by private parties to recover damages for violation of the FLSA's wage and hour provisions. The Court has subject matter jurisdiction over Plaintiffs' FLSA claims based upon 29 U.S.C. § 216(b) and 28 U.S.C. §§ 1331-37.

6. Venue in this district is proper pursuant to 28 U.S.C. § 1391 (b) and (c), because Defendant operates in this district and a substantial part of the unlawful conduct giving rise to the claims occurred in this district.

**PARTIES**

7. Defendant is a foreign corporation that maintains its principal place of business in Tennessee and its Registered Agent for Service of Process in Alabama is Christopher Walker, 3015 5th Street, Northport, Alabama 35476. Defendant does not maintain a physical "brick and mortar" office in Alabama.

8. Plaintiff Jeffrey S. Chapman is a resident of and domiciled in Tuscaloosa County, Alabama.

9. Plaintiff Terrance Anderson is a resident of and domiciled in Tuscaloosa County, Alabama.

10. Plaintiff Ellis Ball is a resident of and domiciled in Tuscaloosa County, Alabama.

11. Plaintiff Christopher Bates is a resident of and domiciled in Tuscaloosa County, Alabama.

12. Plaintiff Glen Bishop is a resident of and domiciled in Hale County, Alabama.

13. Plaintiff Caddell is a resident of and domiciled in Hale County, Alabama.

14. Plaintiff Kenneth Chandler is a resident of and domiciled in Tuscaloosa County, Alabama.

15. Plaintiff James J. Freeman is a resident of and domiciled in Pickens County, Alabama.

16. Plaintiff Kenneth O. Jones is a resident of and domiciled in Tuscaloosa County, Alabama.

17. Plaintiff Cory Nelson is a resident of and domiciled in Tuscaloosa County, Alabama.

18. Plaintiff Lisa Nelson is a resident of and domiciled in Tuscaloosa County, Alabama.

19. Plaintiff Donaldvin Ball is a resident of and domiciled in Tuscaloosa County, Alabama.

20. Plaintiff Christopher S. Cargile is a resident of and domiciled in Tuscaloosa County, Alabama.

21. Plaintiff DeMarcus R. Coats is a resident of and domiciled in Tuscaloosa County, Alabama.

22. Plaintiff Brandon Long is a resident of and domiciled in Tuscaloosa County, Alabama.

## GENERAL ALLEGATIONS

23. Plaintiff Chapman worked for Defendant as a security guard from approximately October 2013 until September 2014.

24. Plaintiff Anderson worked for Defendant as a security guard from approximately July 2010 until February 2013.

25. Plaintiff Ellis Ball worked for Defendant as a security guard from approximately July 2012 until December 2014.

26. Plaintiff Bates worked for Defendant as a security guard from approximately September 2011 until January 2015.

27. Plaintiff Bishop worked for Defendant as a security guard from approximately 2011 until November 2013.

28. Plaintiff Caddell worked for Defendant as a security guard from approximately March 2010 until September 2012.

29. Plaintiff Chandler has worked for Defendant as a security guard from August 2011 until present.

30. Plaintiff Freeman worked for Defendant as a security guard from approximately August 2012 until April 2013 and again from approximately March 2014 until June 2014.

31. Plaintiff Jones worked for Defendant as a security guard from approximately July 2014 until May 10, 2015.

32. Plaintiff Cory Nelson has worked for Defendant as a security guard from approximately January 2015 until present.

33. Plaintiff Lisa Nelson has worked for Defendant as a security guard from approximately August 2014 until present.

34. Plaintiff Donaldvin Ball worked for Defendant as a security guard from approximately February 2014 until January 2015.

35. Plaintiff Christopher S. Cargile has worked for Defendant as a security guard from approximately March 2014 until present.

36. Plaintiff DeMarcus R. Coats worked for Defendant as a security guard and supervisor from approximately May 2011 until February 2015.

37. Plaintiff Brandon Long worked for Defendant as a security guard from approximately August 2010 until September 2013.

38. Defendant was Plaintiffs' employer as the term is defined under the FLSA.

39. Plaintiffs were paid on an hourly basis.

40. Plaintiffs routinely worked in excess of 40 hours in any week.

41. Plaintiff Chapman was paid straight time at the rate of $10.00 per hour for all hours worked throughout his entire employment. From February 16, 2014 to August 2, 2014, Plaintiff worked no less than 327 hours of overtime for which he did not receive time and one half his regular rate of pay. Plaintiff worked additional uncompensated overtime hours for which he does not have his check stubs, from October of 2013 to February 16, 2014.

42. Plaintiff Anderson was paid straight time for all hours worked throughout his entire employment, with his ending pay being $8.75 per hour.

43. Plaintiff Ellis Ball was paid straight time for all hours worked throughout his entire employment, with his ending pay being $9.00 per hour.

44. Plaintiff Bates was paid straight time for all hours worked throughout his entire employment, with his ending pay being $9.25 per hour.

45. Plaintiff Bishop was paid straight time for all hours worked throughout his entire employment, with his ending pay being between $8.50-$9.00 per hour.

46. Plaintiff Caddell was paid straight time for all hours worked throughout his entire employment, with his ending pay being between $8.50-$8.75 per hour.

47. Plaintiff Chandler has been paid straight time for all hours worked throughout his entire employment, with his current pay being $10.00 per hour.

48. Plaintiff Freeman was paid straight time for all hours worked throughout his entire employment, with his ending pay being $9.75 per hour.

49. Plaintiff Jones was paid straight time for all hours worked throughout his entire employment, with his ending pay being $9.25 per hour.

50. Plaintiff Cory Nelson has been paid straight time for all hours worked throughout his entire employment, with his current pay being $9.00 per hour.

51. Plaintiff Lisa Nelson has been paid straight time for all hours worked throughout her entire employment, with her current pay being $9.00 per hour.

52. Plaintiff Donaldvin Ball was paid straight time for all hours worked throughout his entire employment, with his ending pay being between approximately $7.25 to $7.45 per hour.

53. Plaintiff Cargile has been paid straight time for all hours worked throughout his entire employment.

54. Plaintiff Coats was paid straight time for all hours worked throughout his entire employment, with his ending pay being $12.00 per hour.

55. Plaintiff Long was paid straight time for all hours worked throughout his entire employment, with his ending pay being between approximately $8.50 to $8.75 per hour.

56. Plaintiffs' times worked were all recorded and paid in a similar manner.

57. Plaintiffs all worked during the relevant liability period, at least one week in excess of 40 hours.

58. Under Defendant's method of recording and paying for time worked, Plaintiffs were or are not paid for all hours worked at applicable overtime rates because they were or are not compensated at time and a half for all hours worked over forty (40).

59. Defendant and members of its management and supervisors directed Plaintiffs' work.

60. Defendant directed and assigned Plaintiffs to locations where it wanted Plaintiffs to work.

61. Defendant maintained the right to hire, fire, or modify Plaintiffs' employment conditions.

62. Defendant had the power and, in fact, determined the wages of Plaintiffs.

63. Defendant maintains records of the hours worked by Plaintiffs and prepares payroll and tax records related to the Plaintiffs' employment.

64. The locations where the Plaintiffs performed their work was not owned, leased, or negotiated by Plaintiffs.

65. Plaintiffs provided labor to Defendant and they did not invest in or provide their own tools, uniforms, equipment or facilities to accomplish work.

66. The work performed by Plaintiffs required no special skill and Defendant trained Plaintiff in how to perform their work.

67. The work performed by Plaintiffs was directly related to the business of Defendant, which was to solicit Alabama businesses and provide said businesses with security services.

68. As a matter of economic reality, Plaintiffs were dependent on Defendant for extended periods of time for the work they performed and they pay they received.

**COUNT I**

**Violation of the Fair Labor Standards Act of 1938**

69. Plaintiffs reassert and incorporate by reference paragraphs 1 - 68 as set forth above as if fully restated herein.

70. At all material times herein, Plaintiffs have been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. § 201 *et seq.*

71. Plaintiffs are victims of Defendant's uniform and company-wide compensation policy and practice, in violation of the FLSA.

72. Defendant violated the FLSA by failing to pay overtime compensation.

73. The FLSA regulates, among other things, the payment of wages, including overtime pay by employers whose employees are engaged in commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 207(a)(1).

74. Defendant was and is subject to the overtime pay requirements of the FLSA because Plaintiffs were individually engaged in commerce, as evidenced by the following:

A. <u>On a daily basis</u>, Plaintiffs used the instrumentalities of commerce in providing security services to Defendant's customers, as they were required to contact Defendant's office in Chattanooga Tennessee at the beginning of his or her shift, from the customer's premises in Alabama.

i. The purpose of this call was to "Check In" so that Defendant could ensure coverage and attendance.

ii. The purpose of this "Check In" is also for purposes of billing.

iii. To accomplish the "Check In," Defendant provided Plaintiffs with a 1-800 number, which rang to the desk of Brian MacDougle in Tennessee. Mr. MacDougle was responsible for scheduling.

iv. Plaintiffs then provided their name, where they were working, the date, and the time that they arrived and started their shift.

v. If Mr. MacDougle did not answer the line, Plaintiffs were to leave a message containing the requisite information. Plaintiff Chapman personally contacted this 1-800 number and either left messages or spoken with Brian MacDougle.

vi. On one occasion, Plaintiff Chapman was reprimanded when he failed to "Check in."

B. While working at Hudson Poole Fine Jewelry in Tuscaloosa Alabama, Plaintiff Chapman was required <u>on a weekly basis</u> to use the instrumentalities of commerce in that each security guard was required to submit their approved hours worked that week via facsimile to the Tennessee office.

i. Plaintiff Chapman and his co-worker Chris Cargile personally worked at Hudson Poole.

ii. The procedure at Hudson Poole was that each guard would "Check In" with the Tennessee office, as described above.

iii. At the end of the week or their scheduled time to work at Hudson Poole, the security guard was required to seek approval of his or her hours worked from Hudson Poole's owner, Gene Poole. Once signed off on by Mr. Poole, the security guard would then proceed to Mr. Poole's office and fax the approved hours to the Tennessee office at a number provided by Defendant.

iv. Plaintiffs Chapman, Chris Cargile, and the other security guards assigned to Hudson Poole were required to follow these practices.

63. Defendant maintains its physical office in Tennessee and it controls its operations in Alabama through the use of the instrumentalities of commerce, both by its employees in Alabama and Tennessee.

64. Defendant is engaging in interstate commerce, as it is a Tennessee corporation conducting business across state lines through its solicitation of Alabama businesses, obtainment of Alabama business, and its management of those business accounts using the instrumentalities of commerce.

65. Defendant was and is subject to the overtime pay requirements of the FLSA because it is an enterprise engaged in commerce as evidenced by the following:

A. Two or more of Defendant's employees were engaged in commerce:

i. Defendant's General Manager, Brian MacDougall, engages in commerce.

a. Mr. MacDougall resides in Tennessee and maintains his office at Defendant's headquarters in Tennessee.

b. Mr. MacDougall regularly and recurrently travels to Alabama from his office in Tennessee to inspect/audit Plaintiffs' performance, hold conferences, and provide training. Mr. MacDougall travels to Alabama to conduct the business of Defendant every three to four weeks.

c. Mr. MacDougall regularly and recurrently utilizes the instrumentalities of commerce from Tennessee to communicate with Defendant's Apartment Lead, DeMarcus Coats, in Alabama, via telephone, email, and facsimile.

d. Mr. MacDougall regularly and recurrently utilizes the instrumentalities of commerce from Tennessee to communicate with Defendant's Sorority Supervisor/Lead/Trainer, Chris Walker, in Alabama, via telephone, email, facsimile and Federal Express delivery.

e. Mr. MacDougall regularly and recurrently utilizes the instrumentalities of commerce from Tennessee to communicate with security guards in Alabama, including Plaintiff Chapman and others, via telephone.

f. Mr. MacDougall regularly and recurrently travels to Alabama from his office in Tennessee to solicit, acquire, and maintain new customer accounts in Alabama.

g. Mr. MacDougall regularly and recurrently travels to Alabama from his office in Tennessee to "save" existing customer accounts that Defendant is in jeopardy of losing.

h. Mr. MacDougall regularly and recurrently utilizes the instrumentalities of commerce from Tennessee to communicate with Defendant's customers in Alabama, as well as solicit potential customers in Alabama.

ii. Defendant's President/CEO, Tal Abernathy, engages in commerce.

a. Mr. Abernathy resides in Tennessee and maintains his office in Tennessee.

b. Mr. Abernathy regularly and recurrently travels to Alabama from his office in Tennessee to conduct

the business of Defendant, periodically throughout the year, and every other week during football season.

c. Mr. Abernathy regularly and recurrently utilizes the instrumentalities of commerce from Tennessee to communicate with security guards and supervision in Alabama via typed memoranda sent to Alabama from Tennessee by way of Federal Express Delivery.

d. Mr. Abernathy regularly and recurrently travels to Alabama from his office in Tennessee to acquire new customer accounts.

e. Mr. Abernathy regularly and recurrently travels to Alabama from his office in Tennessee to "save" existing customer accounts that Defendant is in jeopardy of losing.

f. Mr. Abernathy regularly and recurrently utilizes the instrumentalities of commerce from Tennessee to communicate with Defendant's customers in Alabama as well as potential customers in Alabama.

iii. Defendant's Apartment Lead, DeMarcus Coats, engaged in commerce.

a. Mr. Coats resides in Alabama and worked in and around Tuscaloosa, Alabama.

b. Mr. Coats was the lead responsible for communicating with Defendant's management and Defendant's employees who are assigned to work at apartment complexes and local businesses.

c. Mr. Coats regularly and recurrently utilized the instrumentalities of commerce from Alabama to communicate with Defendant's General Manager Brian MacDougall and Tal Abernathy, in Tennessee, via telephone, email, and facsimile, regarding and in direct support of Defendant's operations in Alabama.

iv. Defendant's Sorority Supervisor/Lead/Trainer, Chris Walker, engages in commerce.

a. Mr. Walker resides in Alabama and works primarily as a guard at the Phi Mu house in Tuscaloosa, Alabama.

b. Mr. Walker is the lead/supervisor responsible for communicating with Defendant and Defendant's employees who are assigned to work at sorority houses on the campus of The University of Alabama. Mr. Walker is responsible for receiving, in Alabama, weekly payroll checks and other hard copy documents from Defendant's office in Tennessee.

c. Mr. Walker regularly and recurrently utilizes the instrumentalities of commerce from Alabama to communicate with Defendant's General Manager Brian MacDougall in Tennessee, via telephone, email, facsimile, and Federal Express Delivery, regarding Defendant's operations in Alabama.

v. As described above in Paragraph 62(A) and (B), Defendant's Security Guards regularly and recurrently utilize the instrumentalities of commerce in Alabama to communicate with employees in Tennessee in the performance of providing security services in order to communicate with Defendant's General Manager in

Tennessee, Brian MacDougall, via telephone, email, and facsimile.

a. Such communications were directly necessary to the performance of their duties and the services could not be provided otherwise.

vi. An employee of Defendant regularly and recurrently utilizes the instrumentalities of commerce in Tennessee, in dealing with the State of Alabama with regard to:

a. Establishing an Alabama unemployment compensation account number.

(i) Remitting Alabama state unemployment withholdings to Alabama.

b. Establishing an Alabama withholdings account number.

(i) Remitting withheld Alabama state income taxes.

c. Updating and maintaining requisite filings with the Alabama Secretary of State.

d. Filing with Alabama the required forms, such as the Alabama Business Privilege Tax and other similar forms.

vii. An employee of Defendant regularly and recurrently utilizes the instrumentalities of commerce in Tennessee to provide Defendant's employees in Alabama with W-2 tax forms (or form 1099) via U.S. Mail.

viii. An employee of Defendant regularly and recurrently utilizes the instrumentalities of commerce in Tennessee to enter into agreements with contractors in Alabama. Defendant utilizes

the instrumentalities of commerce to remit payment to these contractors and businesses from its operations in Tennessee.

ix. An employee of Defendant regularly and recurrently utilizes the instrumentalities of commerce in Tennessee to contact media in Alabama to place advertisements, remit payments for these advertisements from Tennessee to Alabama, including, but not limited to, advertising in Tuscaloosa Magazine, The Yellow Pages, etc.

x. An employee of Defendant regularly and recurrently utilizes the instrumentalities of commerce in Tennessee to communicate with the University of Alabama, solicit business therefrom and facilitate the maintenance of Defendant as an "approved vendor" for The University of Alabama.

xi. An employee of Defendant regularly and recurrently utilizes the instrumentalities of commerce remitting from Tennessee, payments to Defendant's uniform supplier in Ohio, for uniforms worn by Alabama employees in support of the services they provide.

xii. An employee of Defendant, in Tennessee, regularly and recurrently utilizes the instrumentalities of commerce in negotiating with Alabama businesses/vendors who provide services and products to Defendant, and are paid by Defendant in Tennessee.

xiii. Defendant's Alabama customers regularly and recurrently utilize the instrumentalities of commerce in remitting payments to Defendant's Tennessee head quarters for invoices sent to them via the instrumentalities of commerce from Defendant's Tennessee headquarters.

xiv. Defendant's employees purchase items such as office supplies, general supplies, office equipment, equipment, drug tests, uniforms, security signs, flashlights, badges,

name tags, golf carts, etc., that are in, or traveled in, the stream of interstate commerce, in support of its operations in both Alabama and Tennessee.

B. During the liability period, Defendant's gross sales revenues exceed $500,000 annually.

i. Defendant's operations associated with providing security services to sorority houses located on The University of Alabama's campus generates gross revenues in excess of $160,000.00 on an annual basis.

a. Defendant provides security for at least seven (7) sorority houses.

ii. Defendant's operations associated with providing security services to apartment complexes, local businesses, events and local community pools, etc. generates gross revenues in excess of $500,000 annually.

a. Defendant provides security for at least ten (10) apartment complexes, a jewelry store, The University of Alabama, and a community pool.

iii. In the fall of 2014, Defendant split its security operations into two different legal business entities, one providing security for the University of Alabama, and the other providing security for all other businesses. Plaintiff Demarcus Coats was advised that the purpose of the split was to ensure neither entity's income exceeded $500,000 annually so that the Defendant could avoid paying overtime.

51. Section 13 of the FLSA, 29 U.S.C. § 213, exempts certain categories of employees from overtime pay obligations. None of the FLSA

exemptions apply to the Plaintiffs. Accordingly, Plaintiffs must be paid overtime pay in accordance with the FLSA.

52. Defendant's failure to accurately pay overtime was willfully perpetrated. Defendant has not acted in good faith, nor with reasonable grounds to believe its actions and omissions were not a violation of the FLSA and, as a result thereof, Plaintiffs are entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid overtime premium pay described above pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b). Alternatively, should the Court find that Defendant did not act willfully in failing to pay all hourly wages and overtime premium pay wages, Plaintiffs are entitled to an award of pre-judgment interest at the applicable legal rate.

53. As a result of the aforesaid willful violations of the FLSA's overtime provisions, overtime compensation has been unlawfully withheld by Defendant from Plaintiffs, for which Defendant is liable pursuant to 29 U.S.C. § 216(b).

54. Plaintiffs are entitled to damages equal to the mandated overtime premium pay within the three years preceding the filing of this Complaint, plus periods of equitable tolling, because Defendant acted

willfully and knew, or showed reckless disregard of whether, its conduct was prohibited by the FLSA.

55. Pursuant to FLSA, 29 U.S.C. § 216(b), successful Plaintiffs are entitled to reimbursement of the costs and attorneys' fees expended in successfully prosecuting an action for unpaid wages and overtime wages.

## COUNT II

## FLSA Retaliation Claim

**(Brought Against Defendant Individually By Plaintiff Jeffrey S. Chapman and DeMarcus R. Coats)**

56. Plaintiff Jeffrey S. Chapman's lead, Plaintiff Demarcus Coats, was paid on an hourly basis and he did not receive overtime at the prescribed rates under the Act for hours worked in excess of 40 in any week. Plaintiffs Chapman and Coats have had numerous discussions regarding the illegality of Defendant's pay practices.

57. On or about July 15, 2014, Plaintiff Chapman advised Mr. Coats that he had obtained an attorney who was willing to assist the employees of Defendant in obtaining their overtime pay via a lawsuit. Plaintiff Coats advised Plaintiff Chapman that "he was in."

58. On or about July 17, 2014, Plaintiff Chapman sent a mass text to his co-workers advising them that an attorney was interested in helping

them obtain their unpaid overtime compensation and that Chapman wanted to establish a time they could all meet to discuss the situation. Mr. Coats was a recipient of this text.

59. On August 2, 2014, Plaintiff Chapman was called in and formally disciplined for an occurrence that had happened a month earlier. At the time of the initial occurrence, he was simply given a verbal warning from Plaintiff Coats and told not to let it happen again.

60. A meeting was then held with Plaintiff Coats to discuss Plaintiff Chapman's overtime complaints. During the meeting Tal Abernathy and Tom MacDougall asked Plaintiff Coats to cut Plaintiff Chapman's hours significantly.

61. Abernathy was mad and wanted the hours cut to 10 per week, but MacDougall disagreed and wanted the hours cut gradually because he was afraid a drastic cut would show their retaliation.

62. Plaintiff Chapman's hours were cut from 50 – 60 hours, to roughly 30 hours a week, down to 10 hours a week, and then to 5 hours.

63. Ultimately, Defendant stopped assigning Plaintiff Chapman any hours to work, despite his availability on the schedule, and despite the fact

that his co-workers who had not tried to address overtime concerns continued to receive hours at their same level or greater.

64. On October 14, 2014, Plaintiff filed his initial Complaint against Defendant. Within that Complaint, Plaintiff identified his lead, Plaintiff Demarcus Coats, as a co-worker who believed he was owed overtime compensation and who was interested in participating in litigation against the Defendant.

65. With notice of Plaintiff Coats' belief that he was entitled to overtime compensation, and that Plaintiff Coats intended to participate in the litigation, Tal Abernathy advised Plaintiff Coats that if employees joined, or if it looked like he would lose the case, that Abernathy would close the company and declare bankruptcy.

66. Knowing Abernathy's threat of closing the business, and MacDougall's insistence that the retaliation be concealed, Plaintiff Coats was sent to Defendant's attorney's office and asked to give a declaration.

67. Knowing Chapman lost his job for complaining about overtime, Plaintiff Coats was afraid of losing his job too, so Plaintiff Coats, with questions and coaching from the attorneys, gave a declaration consistent with MacDougall's mandate that the retaliation be hid.

68. Having given the statement, two weeks later Plaintiff Coats was wrongly terminated under false pretenses.

69. Plaintiff Chapman's reporting of overtime violations and attempts to organize employees to put a stop to said violations constitutes protected activity, and Defendant violated the FLSA by effectively terminating Plaintiff Chapman for engaging in a protected activity.

70. Plaintiff Demarcus Coats' expression of his interest to participate in the litigation to enforce his overtime rights, and his statement that "he is in" constitutes protected activity, and Defendant violated the FLSA by effectively terminating Plaintiff Coats for engaging in a protected activity.

71. The FLSA prohibits employers from discharging or in any other manner discriminating against any employee because such employees have or were perceived to have made a complaint or instituted or caused to be instituted any proceeding, under or related to Fair Labor Standards Act. 29 U.S.C. § 215(a)(3).

72. Defendant has not acted in good faith nor with reasonable grounds to believe its actions in terminating Plaintiff Chapman and Demarcus Coats were not a violation of the FLSA and, as a result thereof,

Plaintiffs Chapman and Coats are entitled to recover lost wages, an award of liquidated damages in an amount equal to his lost wages and benefits pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b), attorneys fees and costs.

73. As a result of the aforesaid willful violations of the FLSA's anti-retaliation provisions, Plaintiffs Chapman and Coats have suffered lost wages, reduced benefits, and mental anguish for which Defendant is liable pursuant to 29 U.S.C. § 216(b).

74. Pursuant to FLSA, 29 U.S.C. § 216(b), Plaintiff Chapman and Coats are also entitled to reimbursement of the costs and attorneys' fees expended in successfully prosecuting an action for retaliation.

WHEREFORE, it is respectfully prayed that this Court grant to the Plaintiffs the following relief:

A. Issue an Order directing and requiring Defendant to pay Plaintiffs damages in the form of overtime wages for all time spent in excess of 40 hours per week performing compensable work for which they were not paid pursuant to the rate provided by the FLSA;

B. Issue an Order directing and requiring Defendant to pay Plaintiffs liquidated damages pursuant to the FLSA in an amount equal to, and in addition to the amounts of wages and overtime wages owed to them;

C. Issue an Order directing and requiring Defendant to pay Plaintiffs Chapman and Coats lost wages, lost benefits and compensatory damages as a result of their actual/constructive discharge in retaliation for their participation in, or perceived participation in protected activity;

D. Issue an Order directing Defendant to reimburse Plaintiffs for the costs and attorneys' fees expended in the course of litigating this action, together with pre-judgment and post-judgment interest; and

E. Provide Plaintiffs with such other and further relief, as the Court deems just and equitable.

Respectfully submitted,

/s/ *Robert J. Camp*

**ROBERT J. CAMP**
rcamp@wigginschilds.com
**WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB, LLC**
The Kress Building
301 19th Street North
Birmingham, AL 35203
(205) 314-0500 – Phone
(205) 254-1500 – Facsimile

***Plaintiff's Counsel***

**JURY DEMAND**

Plaintiff demands a trial by struck jury on all issues triable by jury.

/s/ *Robert J. Camp*
**ROBERT J. CAMP**